# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

DENISE A. BLEAU,

      Plaintiff,

v.                                   Civ. No. 19-300 KK

ANDREW M. SAUL, Commissioner of the
Social Security Administration,[1]

      Defendant.

## MEMORANDUM OPINION AND ORDER[2]

THIS MATTER is before the Court on Plaintiff Denise A. Bleau's Motion to Reverse and Remand for a Rehearing With Supporting Memorandum (Doc. 17), filed August 5, 2019, seeking review of Defendant the Commissioner of the Social Security Administration's decision denying Ms. Bleau's claim for Title II disability insurance benefits and Title XVI supplemental security income benefits under 42 U.S.C. §§ 405(g) and 1383(c)(3).  The Commissioner filed a response in opposition to the motion on November 6, 2019, (Doc. 21), and Ms. Bleau filed a reply in support of it on November 20, 2019.  (Doc. 22.)

Having meticulously reviewed the entire record and the relevant law and being otherwise fully advised, the Court finds that Ms. Bleau's motion is well taken and should be GRANTED.

## I.  Legal Standards

### A.  Standard of Review

---

[1] Andrew Saul was sworn in as the Commissioner of Social Security on June 17, 2019, and is automatically substituted as a party under 42 U.S.C. § 405(g) and Federal Rule of Civil Procedure 25(d).

[2] Pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have consented to the undersigned United States Magistrate Judge to conduct dispositive proceedings and order the entry of final judgment in this case. (Doc. 9.)

This Court must affirm the Commissioner's final decision denying social security benefits unless: (1) "substantial evidence" does not support the decision; or, (2) the Administrative Law Judge ("ALJ") did not apply the correct legal standards in reaching the decision. 42 U.S.C. §§ 405(g), 1383(c)(3); *Maes v. Astrue*, 522 F.3d 1093, 1096 (10th Cir. 2008); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). The Court must meticulously review the entire record but may "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* Although the Court may not re-weigh the evidence or try the issues *de novo*, its consideration of the record must include "anything that may undercut or detract from the [agency]'s findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart*, 399 F.3d 1257, 1262 (10th Cir. 2005). "The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the agency's] findings from being supported by substantial evidence." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Thus, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the ALJ . . . must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## B.      Disability Determination Process

A person must, *inter alia*, be "under a disability" to qualify for disability insurance benefits under Title II; similarly, a "disabled" person may qualify for supplemental security income benefits under Title XVI.  42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1).  An individual is considered disabled if she is unable

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).

The Commissioner has adopted a five-step sequential analysis to determine whether a person satisfies the statutory criteria:

(1)      At step one, the ALJ must determine whether the claimant is engaging in "substantial gainful activity."[3]  If the claimant is engaging in substantial gainful activity, she is not disabled regardless of her medical condition.

(2)      At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s).  If the claimant does not have an impairment (or combination of impairments) that is severe and meets the duration requirement, she is not disabled.

(3)      At step three, the ALJ must determine whether a claimant's impairment meets or equals in severity one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P, and meets the duration requirement.  If so, a claimant is presumed disabled.

(4)      If none of the claimant's impairments meet or equal one of the listings, the ALJ must determine at step four whether the claimant can perform her "past relevant work."  This step involves three phases.  *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ must consider all of the relevant evidence and determine what is "the most [claimant] can still do despite [her physical and mental] limitations."    20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). This is called the claimant's residual functional capacity

---

[3] "Substantial work activity is work activity that involves doing significant physical or mental activities."  20 C.F.R. §§ 404.1572(a), 416.972(a).  "[W]ork may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."  *Id.*  "Gainful work activity is work activity that you do for pay or profit."  20 C.F.R. §§ 404.1572(b), 416.972(b).

("RFC"). *Id.* Second, the ALJ must determine the physical and mental demands of the claimant's past work. Third, the ALJ must determine whether, given the claimant's RFC, the claimant is capable of meeting those demands. A claimant who is able to perform her past relevant work is not disabled.

(5)     If the claimant is unable to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience. If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

20 C.F.R. § 404.1520(a)(4) (disability insurance benefits); 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan*, 399 F.3d at 1261. The claimant has the initial burden of establishing a disability in the first four steps of this analysis. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987). The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy. *Id.* A finding that the claimant is disabled or not disabled at any point in the five-step evaluation process is conclusive and terminates the analysis. *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

## II. Background and Procedural History

### A.    Factual Background

Ms. Bleau alleges that she became disabled on June 24, 2015, at 45 years of age, due to tremors, bipolar disorder, and benign essential tremors. (AR 77-118.)[4] She is a high school graduate who previously worked as a certified nursing assistant and a grocery stocker. (AR 57-58.) Ms. Bleau testified that her tremors, which anxiety and lifting exacerbate, make it difficult for

---

[4] Citations to "AR" are to the transcript of the administrative record filed in this matter on June 6, 2019. (Doc. 13.)

her to work.  (AR 59.)  Additionally, she testified that her severe depression and anxiety make it hard for her to concentrate or remember instructions in work environments.  (AR 60.)

Ms. Bleau saw Antonio P. Carlino, D.O., on June 19, 2015, for tremors, anxiety, and depression.  (AR 332.)  Dr. Carlino diagnosed Ms. Bleau with tremors of the nervous system, major depression, anxiety, and insomnia.  (AR 334.)  He prescribed various medications, including Effexor,[5] Lorazepam,[6] and Primidone.[7]  (AR 334-35.)  Shortly thereafter, Ms. Bleau was hospitalized for several days due to a mental breakdown and was diagnosed with bipolar affective disorder.  (AR 328, 337, 407, 415.)  Ms. Bleau saw Dr. Carlino again on July 6, 2015, and reported some improvement in her tremors and depression.  (AR 328-29.)  Dr. Carlino added Trazodone[8] to Ms. Bleau's prescription medications at this appointment.  (AR 331.)

Ms. Bleau began seeing Michael Sievert, M.D., a psychiatrist, on October 15, 2015.  (AR 367.)  Dr. Sievert diagnosed her with bipolar affective disorder, mixed, severe, and post-traumatic stress disorder ("PTSD").  (AR 370.)  He continued Ms. Bleau's prescription for Trazodone and added prescriptions for Latuda[9] and Propranolol.[10]  (*Id.*)  When Dr. Sievert saw Ms. Bleau again

---

[5] Effexor, or Venlafaxine, "is used to treat depression[,] generalized anxiety disorder . . . , social anxiety disorder . . . , and panic disorder."  https://medlineplus.gov/druginfo/meds/a694020.html (last visited Feb. 24, 2020).

[6] "Lorazepam is used to treat anxiety."  https://medlineplus.gov/druginfo/meds/a682053.html (last visited Feb. 24, 2020).

[7] "Primidone is used alone or with other medications to control certain types of seizures.  [It] is in a class of medications called anticonvulsants.  It works by decreasing abnormal electrical activity in the brain."  https://medlineplus.gov/druginfo/meds/a682023.html (last visited Feb. 24, 2020).

[8] "Trazadone is used to treat depression."  https://medlineplus.gov/druginfo/meds/a681038.html (last visited Feb. 24, 2020).

[9] Latuda, or Lurasidone, "is used to treat the symptoms of schizophrenia[, and] . . . depression in adults and children 10 years of age and older with bipolar disorder."  https://medlineplus.gov/druginfo/meds/a611016.html (last visited Feb. 24, 2020).

[10] "Propranolol is used to treat high blood pressure, irregular heart rhythms, pheochromocytoma . . . , certain types of tremor, and hypertrophic subaortic stenosis . . . ."  https://medlineplus.gov/druginfo/meds/a682607.html (last visited Feb. 24, 2020).

on March 17, 2016, he noted that her symptoms were "poorly controlled" and added a diagnosis of borderline personality disorder. (AR 466, 469.) He also placed Ms. Bleau on Geodon,[11] Mirtazapine,[12] and Hydroxyzine[13] and encouraged her to continue psychotherapy. (AR 468-69.)

Ms. Bleau began attending psychotherapy sessions with Vashti Jean Schweedler, L.P.C.C., on December 11, 2015. (AR 475-78.) She continued to attend sessions with Ms. Schweedler regularly through November 7, 2017. (AR 539-641.)

On March 19 and 20, 2016, Ms. Bleau was seen in Presbyterian Hospital's emergency department after attempting suicide by over-the-counter sleeping pills and prescription anxiety medication. (AR 681-84.) Ms. Bleau reported a history of suicide attempts. (*Id.*) She was diagnosed with insomnia and depression and transferred for a Behavioral Health evaluation. (*Id.*)

Ms. Bleau saw Miles Lessen, P.M.H.N.P., throughout 2017 for medication management. (AR 515-38.) Mr. Lessen added Amitriptyline[14] and Aripiprazole[15] to Ms. Bleau's medication regimen on February 16, 2017. (AR 515-19.)

## B.    Procedural History

On July 30, 2015, Ms. Bleau applied for disability insurance benefits under Title II and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§

---

[11] Geodon, or Ziprasidone, "is used to treat the symptoms of schizophrenia. . . . It is also used to treat episodes of mania . . . in patients with bipolar disorder." https://medlineplus.gov/druginfo/meds/a699062.html (last visited Feb. 24, 2020).

[12] "Mirtazapine is used to treat depression." https://medlineplus.gov/druginfo/meds/a697009.html (last visited Feb. 24, 2020).

[13] Hydroxyzine is "used alone or with other medications in adults and children to relieve anxiety and tension." https://medlineplus.gov/druginfo/meds/a682866.html (last visited Feb. 24, 2020).

[14] "Amitriptyline is used to treat symptoms of depression." https://medlineplus.gov/druginfo/meds/a682388.html (last visited Feb. 24, 2020).

[15] "Aripiprazole is used to treat the symptoms of schizophrenia[,] . . . [and] mania or mixed episodes . . . in [people] with bipolar disorder" and is also "used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone." https://medlineplus.gov/druginfo/meds/a603012.html (last visited Feb. 24, 2020).

401–434 and 1381–1383f. (AR 119-20.) She alleged a disability onset date of June 24, 2015. (AR 77.) The agency found that Ms. Bleau was not disabled, both initially and on reconsideration. (AR 77-118, 121-54). Ms. Bleau requested a hearing with an ALJ on the merits of her application. (AR 172.)

ALJ Cole Gerstner conducted a hearing in Albuquerque on January 9, 2018. (AR 55.) Ms. Bleau appeared at the hearing with her attorney, Michael Armstrong. (*Id.*) The ALJ took testimony from Ms. Bleau and from an impartial vocational expert ("VE"), Thomas A. Greiner. (AR 53-76.) The ALJ issued an unfavorable decision on April 3, 2018. (AR 23.) On January 31, 2019, the Appeals Council denied Ms. Bleau's request for review, rendering the ALJ's decision the Commissioner's final decision from which Ms. Bleau now appeals. (AR 1.)

**C.      The ALJ's Decision**

The ALJ determined at step one of the sequential evaluation process that Ms. Bleau had not engaged in substantial gainful activity since her alleged onset date. (AR 12.) At step two, the ALJ found that Ms. Bleau has the severe impairments of: (1) depression; (2) bipolar affective disorder; (3) benign tremors; and (4) obesity. (*Id.*) The ALJ explained that although Ms. Bleau's medical records referred to Parkinson's disease, they did not include a definitive diagnosis, and a treating provider described her symptoms as unusual for Parkinson's disease. (AR 13.) Based on a lack of objective evidence, the ALJ determined that Ms. Bleau did not have Parkinson's disease as a medically-determinable impairment. (*Id.*)

The ALJ determined at step three that Ms. Bleau's impairments do not meet or medically equal the severity of one of the listings described in Appendix 1 of 20 C.F.R. Part 404, Subpart P. (AR 13-15.) As a result, the ALJ proceeded to step four, where he found that Ms. Bleau has the following RFC:

light work as defined in 20 [C.F.R. §§] 404.1567(b) and 416.957(b) except she can lift up to 20 pounds occasionally and 10 pounds frequently; she can carry up to 20 pounds occasionally and 10 pounds frequently; sit for up to 6 hours in an 8-hour day; stand for up to 6 hours in an 8-hour day; walk for up to 6 hours in an 8-hour day; and she can push and/or pull as much as she can lift and/or carry. [Ms. Bleau] is limited to occasional fingering with the left hand. [She] can climb ramps and stairs occasionally, but never climb ladders, ropes, or scaffolds. She can balance, stoop, kneel, and crouch occasionally. She can never crawl. . . . [She] can never work at unprotected heights or around moving mechanical parts. [She] is limited to simple, routine tasks, and use of judgment is limited to simple work-related decisions. She can have only superficial contact with supervisors, coworkers, and the public. Changes in the work setting would be limited to simple work-related decisions.

(AR 15.) The ALJ also found at step four that Ms. Bleau is unable to perform her past relevant work as a nurse assistant. (AR 21.) However, at step five, the ALJ determined that, based on Ms. Bleau's RFC, age, education, work experience, and the VE's testimony, there are jobs that exist in significant numbers in the national economy which she can perform and as such she is not disabled. (AR 21-22.)

## III. Analysis

In support of her motion to remand, Ms. Bleau argues that: (1) the Appeals Council erred in determining that the additional evidence she submitted to it after the ALJ issued his decision was not new, material, and chronologically pertinent; (2) the ALJ erred by providing illegitimate reasons for rejecting the opinions of her treating physician and treating psychiatrist; (3) the ALJ erred by providing inadequate reasons for rejecting the assessment of her treating counselor; and, (4) the ALJ's step-five finding is not supported by substantial evidence. (Doc. 17 at 2.) For the reasons that follow, the Court reaches only the first issue and concludes that the Appeals Council erred by declining to consider the additional evidence Ms. Bleau submitted. As a result of this error, the case requires remand.

**A.** **The Appeals Council erred by declining to consider the additional evidence Ms. Bleau submitted.**

The ALJ issued his unfavorable decision on April 3, 2018.  (AR 10-23.)  Thereafter, on May 16, 2018, Ms. Bleau submitted additional evidence to the Appeals Council, requesting that it consider the following records from Robert Krueger, Ph.D., F.I.C.P.P.:

1. Report of Psychological Evaluation, dated May 5, 2018, (AR 36-42);
2. Wide Range Achievement Test-Revised ("WRAT-R") form, dated May 4, 2018, (AR 43);
3. Wechsler Adult Intelligence Scale-Fourth Edition ("WAIS-IV") Record Form, dated May 4, 2018, (AR 44);
4. Bender Visual Motor Gestalt drawings, (AR 41, 45);
5. Beck Depression Inventory ("BDI") form, dated May 4, 2018, (AR 46-47);
6. Medical Assessment of Ability to do Work-Related Activities (Mental), dated May 5, 2018, (AR 48-49);
7. Depressive, Bipolar and Related Disorders (12.04) listing form, dated May 5, 2018, (AR 50);
8. Anxiety-Related Disorders (12.06) listing form, dated May 5, 2018, (AR 51); and,
9. Personality Disorders (12.08) listing form, dated May 5, 2018.  (AR 52.)

The Appeals Council acknowledged that Ms. Bleau submitted a "psychological evaluation from Robert Krueger, Ph.D[.] dated May 5, 2018 (19 pages)" but determined that this additional evidence did "not show a reasonable probability that it would change the outcome of the decision."[16]  (AR 2.)  As a result, the Council "did not exhibit this evidence."  (*Id.*)

Whether additional evidence qualifies for consideration by the Appeals Council is a question of law subject to *de novo* review.  *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003).  The Appeals Council must review additional evidence if it "is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision."  20 C.F.R. §§ 404.970(a)(5),

---

[16] Ms. Bleau submits that the Appeals Council's decision "address[ed] only the psychological evaluation report" and not "the MSS or Listing forms."  (Doc. 17 at 12-13.)  Presumably, Ms. Bleau is arguing that the Appeals Council's review of documents was limited to Dr. Krueger's six-page report entitled "Report of Psychological Evaluation."  (*See* AR 36-42.)  However, the Appeals Council described the "psychological evaluation" as comprising 19 pages. (AR 2.)  As such, the Court is satisfied that the Council reviewed all of the additional evidence Ms. Bleau submitted and simply referred to it collectively as Dr. Krueger's "psychological evaluation."  (*Id.*)

416.1470(a)(5).[17]   In addition, the claimant must show "good cause for missing the deadline to submit the evidence in [20 C.F.R. §§ 404.935 and 416.1435]."   20 C.F.R. §§ 404.970(c), 416.1470(c).

If additional evidence does *not* qualify for the Appeals Council's consideration, "it plays no further role in judicial review of the Commissioner's decision." *Copelin v. Saul*, No. 18-CV-0727-KK, 2019 WL 4739536, at *7 (D.N.M. Sept. 27, 2019) (citing *Chambers v. Barnhart*, 389 F.3d 1139, 1142 (10th Cir. 2004)).   If the evidence *does* qualify and the Appeals Council considers it, "it becomes part of the record that the district court assesses in evaluating the Commissioner's denial of benefits." *Id*.   However, if the Appeals Council errs by not considering qualifying additional evidence, as Ms. Bleau contends happened here, "the case must be remanded so that the Appeals Council may evaluate the ALJ's decision in light of the completed record." *Id*. (citing *Casias v. Saul*, 18-CV-00537-LF, 2019 WL 4013890, at *3-4 (D.N.M. Aug. 26, 2019)).

As a preliminary matter, the Court notes that the Appeals Council did not discuss whether Ms. Bleau demonstrated good cause for missing the deadline to submit evidence to the ALJ.  (*See* AR 2.)   As such, Ms. Bleau maintains that the Court need not analyze the question of good cause here.  (Doc. 27 at 12-14.)   Alternatively, she contends that she *did* have good cause for submitting Dr. Krueger's records after the ALJ's decision, because the records did not exist when the decision issued.  (Doc. 17 at 14.)   The Commissioner takes no position on this point.   The Court agrees with Ms. Bleau that, under the circumstances, it need not undertake a good-cause analysis.  *See Emmons v. Saul*, No. 19-CV-0102 KBM, 2020 WL 376708, at *5 (D.N.M. Jan. 23, 2020) (declining to reach the issue of good cause for failure to timely submit additional evidence, where the Appeals

[17] The Social Security Administration revised these regulations effective January 17, 2017.  81 Fed. Reg. 90, 987 (Dec. 16, 2016).  Thus, the revisions were in effect when the Appeals Council issued its decision in this case on January 31, 2019.

Council did not reject the evidence on that basis); *Holder v. Berryhill*, No. 17-CV-1206 LF, 2019 WL 2716758, at *4 (D.N.M. June 28, 2019) (same).

Ms. Bleau next argues that the Appeals Council erred when it declined to consider Dr. Krueger's records, because the evidence is new, material, and chronologically pertinent. (Doc. 17 at 11-17.) In contrast, the Commissioner suggests that it is of no consequence whether Dr. Krueger's records meet these standards, because the Appeals Council actually considered the additional evidence but found it inadequate to "upset the ALJ's decision." (Doc. 21 at 9.) Relying on *Vallejo v. Berryhill*, 849 F.3d 951 (10th Cir. 2017), the Commissioner asserts that "[t]he district court's *only option* is to conduct a substantial-evidence review by assessing the entire agency record." (*Id*. at 9-10 (emphasis in original) (brackets omitted).) These contrasting arguments reveal a divide in the parties' understanding of the Appeals Council's treatment of the additional evidence.

In *Vallejo*, the Tenth Circuit held that when the Appeals Council accepts and considers additional evidence submitted by a claimant, it becomes a part of the record the Court must consider in performing a substantial evidence review. 849 F.3d at 955. However, this case is distinguishable from *Vallejo*. Here, the Appeals Council explicitly declined to "exhibit" the additional evidence, asserting that it did "not show a reasonable probability that it would change the outcome of the decision." (AR 2.) The "reasonable probability" standard is one that "relates to whether evidence qualifies for consideration (and therefore review by the Appeals Council) and does not indicate how the Appeals Council evaluated the evidence in conjunction with the rest of the record." *Holder*, 2019 WL 2716758, at *4 (citing *Threet*, 353 F.3d at 1191-92; *Bisbee v. Berryhill*, No. 18-CV-0731 SMV, 2019 WL 1129459, at *3 & n.5 (D.N.M. Mar. 12, 2019)). Thus, in stating that Ms. Bleau's additional evidence did not satisfy the "reasonable probability" standard

and declining to exhibit it, the Appeals Council implicitly determined that the evidence did not qualify for consideration in its substantial evidence review. *See Secatero v. Saul*, No. 19-CV-0087 SCY, 2020 WL 419463, at *5 (D.N.M. Jan. 27, 2020) (rejecting the Commissioner's argument that the Appeals Council actually "considered" the additional evidence and concluding instead that the Appeals Council's "dismissal of the additional evidence's import [under the "reasonable probability" standard] indicate[d] that it ultimately found the evidence did not qualify for consideration at all").

Because the Appeals Council did not consider the additional evidence in its review of the record, the Court may not now consider it "under the deferential substantial-evidence standard." *Chambers*, 389 F.3d at 1143. Instead, the Court must determine, under *de novo* review, whether the Appeals Council erroneously refused to consider qualifying additional evidence. *See Secatero*, 2020 WL 419463, at *5. If so, "the case must be remanded so that the Appeals Council may evaluate the ALJ's decision in light of the completed record." *Id.* In short, the proper inquiry here is the one Ms. Bleau advances, *i.e.*, whether the additional evidence qualified as new, material, and chronologically pertinent. *See Krauser v. Astrue*, 638 F.3d 1324, 1328 (10th Cir. 2011).

### 1. The additional evidence is new.

Ms. Bleau claims that Dr. Krueger's records constitute "new" evidence. (Doc. 17 at 15.) Additional evidence is "new" if it is "not duplicative or cumulative." *See Threet*, 353 F.3d at 1191. Ms. Bleau maintains, and the Court agrees, that the subject records are neither duplicative nor cumulative. (Doc. 17 at 15.)

First, the records in question did not exist when the ALJ issued his decision in this case. The ALJ issued his decision on April 3, 2018, and Dr. Krueger evaluated Ms. Bleau a month later, on May 4 and 5, 2018. (*Compare* AR 10-23 *with* AR 36-52.) Also, the records include test results

that do not appear elsewhere in Ms. Bleau's medical records, including results from the WRAT-R, the WAIS-IV, the Bender Visual Motor Gestalt, and the BDI. (*See* AR 36-47.) Finally, given the timing of his evaluation, Dr. Krueger was able to review all of Ms. Bleau's medical records from the relevant time period before formulating his opinions, rendering these opinions "new" in the sense of being uniquely comprehensive. (*See* AR 36-52.) Thus, Dr. Krueger's records are neither duplicative nor cumulative and constitute "new" evidence within the meaning of 20 C.F.R. §§ 404.970(a)(5) and 416.1470(a)(5).

### 2. The additional evidence is chronologically pertinent.

Ms. Bleau also maintains that the additional evidence she submitted to the Appeals Council is chronologically pertinent. (Doc. 17 at 16-17.) The Commissioner points out that Dr. Krueger evaluated Ms. Bleau and provided his opinions a month after the ALJ's decision but does not otherwise argue that his records lack chronological pertinence. (*See* Doc. 21 at 10.) Evidence is chronologically pertinent if it relates to the time period the ALJ adjudicated – that is, "the period 'on or before the date of the [ALJ's] hearing *decision*.'" *Chambers*, 389 F.3d at 1143 (quoting 20 C.F.R. § 404.970(b)) (emphasis in original). In assessing chronological pertinence, the Tenth Circuit has focused on whether the additional evidence pertains to impairments or symptoms that pre-date the ALJ's decision, and not on when the evidence was generated. *See Padilla v. Colvin*, 525 F. App'x 710, 711 (10th Cir. 2013).

Here, Dr. Krueger's records relate to the time period the ALJ adjudicated, in that they bear upon impairments that Ms. Bleau had during the relevant period that the ALJ considered, *i.e.*, depression, bipolar affective disorder, tremors, and obesity. (*See* AR 36-42.) The records corroborate these impairments and document Dr. Krueger's opinions regarding the functional limitations they imposed on Ms. Bleau. (*See id.*) Notably in this regard, Dr. Krueger evaluated

Ms. Bleau a mere month after the ALJ's decision, minimizing the extent to which he could have based his opinions on an exacerbation of Ms. Bleau's symptoms outside the relevant time frame. (*Compare* AR 10-23, *with* AR 36-52.)

Further, the records themselves document in several ways that they relate to the time period the ALJ adjudicated. The Medical Assessment of Ability to Do Work-Related Activities (Mental) Dr. Krueger completed instructed him to consider Ms. Bleau's "medical history and chronicity of findings as from 6/2015 to current examination." (AR 48.) There is no indication in the record that Dr. Krueger neglected to do so. Instead, his report indicates that he performed a "Review of Records" and considered Ms. Bleau's impairments from a longitudinal perspective. (*See* AR 36-52.) He explained that Ms. Bleau's records "indicate a previous diagnosis of Bipolar II disorder" as well as "a history of PTSD and also [generalized anxiety disorder]." (AR 38-39, 41.) Likewise, he concluded that Ms. Bleau's "impairments clearly are of long-term duration and can be expected to persist for more than one year." (AR 42.) In sum, Dr. Krueger's reports demonstrate his intent to offer opinions applicable not only to the date of his evaluation but also to the time period relevant to the ALJ's decision. Accordingly, Dr. Krueger's reports are chronologically pertinent.

### 3. The additional evidence is material.

Before 20 C.F.R. §§ 404.970 and 416.1470 were revised in 2017, evidence was considered "material" if there was a "reasonable *possibility* that it would have changed the outcome." *See Threet*, 353 F.3d at 1191 (emphasis added). However, recent revisions to these regulations have effectively heightened the materiality standard, requiring a claimant to now show a reasonable *probability* that the additional evidence would have changed the outcome of the disability claim. *See Copelin*, 2019 WL 4739536, at *7 (citing *Bisbee*, 2019 WL 1129459, at *3 n.5) (noting that the new regulations "heighten[] the claimant's burden to prove materiality; whereas the previous

test required merely a reasonable *possibility* of changing the outcome, now it requires a reasonable *probability* of changing the outcome") (emphases in original); *see also Cordova v. Saul*, No. 19-CV-0126-LF, 2020 WL 614577, at *3 (D.N.M. Feb. 10, 2020); *Tolbert-Taylor v. Saul*, No. 19-CV-0195 CG, 2020 WL 376639, at *5 (D.N.M. Jan. 23, 2020). Thus, the materiality of Dr. Krueger's records hinges on whether there is a reasonable probability that they would have changed the outcome of Ms. Bleau's disability claims.

The Appeals Council found no reasonable probability that Dr. Krueger's records would change the outcome of Ms. Bleau's claims. Ms. Bleau maintains otherwise. The Commissioner does not directly address this issue, but instead urges the Court to conduct a substantial-evidence analysis and to apply the regulatory factors for weighing treating source opinions. (Doc. 21 at 10.) However, as discussed above, that is not the proper inquiry here. Rather, the Court must determine whether Dr. Krueger's reports constitute new, chronologically pertinent, and material evidence. *See Leyba v. Berryhill*, No. 16-CV-1221 KK, 2018 WL 671189, at *8 (D.N.M. Feb. 1, 2018) (reasoning that because the Appeals Council did not accept or consider the new evidence in denying the plaintiff's request for review, it would be improper to conduct a substantial-evidence review before remanding).

The Court begins its *de novo* review of the materiality of Dr. Krueger's reports by comparing the ALJ's RFC determination with Dr. Krueger's opinions. The ALJ found Ms. Bleau capable of light work with additional restrictions. (AR 15.) The RFC he assigned to Ms. Bleau included manipulative, postural, and environmental restrictions, and, most relevant to the present analysis, accounted for Ms. Bleau's mental impairments by limiting her to "simple, routine tasks" and "simple work-related decisions" with only "superficial contact with supervisors, coworkers, and the public." (*Id.*) He also determined that "[c]hanges in the work setting would be limited to

simple work-related decisions." (*Id*.) Notwithstanding these limitations, the ALJ found that Ms. Bleau could perform the requirements of jobs that exist in significant numbers in the national economy, such as Marker (DOT #209.587-034) and Cafeteria Attendant (DOT #311.677-010). (AR 22, 74.)

In contrast, Dr. Krueger found that Ms. Bleau had *marked*[18] mental limitations caused by psychological symptoms in her abilities to: (1) "[u]nderstand and remember very short and simple instructions"; (2) "[u]nderstand and remember detailed instructions"; (3) "[c]arry out detailed instructions"; (4) "[m]aintain attention and concentration for extended periods of time (i.e. 2-hour segments)"; (5) "[p]erform activities within a schedule, maintain regular attendance and be punctual within customary tolerance"; (6) "[s]ustain an ordinary routine without special supervision"; (7) "[w]ork in coordination with/or proximity to others without being distracted by them"; (8) "[c]omplete a normal workday and workweek without interruptions from psychological based symptoms and to perform at a consistent pace without unreasonable number and length of rest periods"; (9) "[i]nteract appropriately with the general public"; (10) "[r]espond appropriately to changes in the work place"; and, (11) "[t]ravel in unfamiliar places or use public transportation." (AR 48-49.) In addition, Dr. Krueger found that Ms. Bleau had *moderate*[19] mental limitations caused by psychological symptoms in her abilities to: (1) "[r]emember locations and work-like procedures"; (2) "[c]arry out very short and simple instructions"; (3) "[m]ake simple work-related decisions"; (4) "[a]sk simple questions or request assistance"; (5) "[g]et along with coworkers or

---

[18] The Medical Assessment form Dr. Krueger completed defined "marked" as "[a] severe limitation which **precludes** the individual's ability usefully to perform the designated activity on a regular and sustained basis, i.e., 8 hours a day, 5 days a week, or an equivalent schedule." (AR 48 (emphasis in original).)

[19] The Medical Assessment form defined "moderate" as "[a] limitation that **seriously interferes** with the individual's ability to perform the designated activity on a regular and sustained basis, i.e. 8 hours a day, 5 days a week, or an equivalent schedule." (AR 48 (emphasis in original).) The form explained that an individual with a moderate limitation "may be able to perform this work-related mental function on a limited basis" but "should not be placed in a job setting where [the] mental function is critical to job performance or to job purpose." (*Id*.)

peers without distracting them or exhibiting behavioral extremes"; (6) "[m]aintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness"; (7) "[b]e aware of normal hazards and take adequate precautions"; and, (8) "[s]et realistic goals or make plans independently of others."   (*Id.*)

Dr. Krueger's opinions call into question the ALJ's RFC assessment because, if adopted, they would establish significantly greater limitations on Ms. Bleau's ability to do work-related activities.  In fact, a number of the impairments Dr. Krueger identified would preclude Ms. Bleau from working altogether. According to the Program Operations Manual Systems ("POMS"), the following abilities, which Dr. Krueger found to be markedly impaired in Ms. Bleau, are critical to performing *any* job: (1) "to understand and remember very short and simple instructions"; (2) "to maintain concentration and attention for extended periods"; (3) "to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances"; (4) "to sustain an ordinary routine without special supervision"; (5) "to work in coordination with or proximity to others without being (unduly) distracted by them"; (6) "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."; and, (7) "to respond appropriately to changes in (a routine) work setting." (*Compare* Social Sec. Admin., DI § 25020.010(b)(2)(a)-(d), POMS, https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010 (last visited Feb. 24, 2020) *with* AR 48-49.)

The Commissioner suggests that Dr. Krueger's records are nevertheless immaterial because the ALJ rejected the similar opinions of Ms. Schweedler, Dr. Sievert, and Mr. Lessen on the bases that "they were inconsistent with [Ms. Bleau's] daily activities" and Ms. Bleau's "mental status examinations were generally normal and her bipolar was controlled with medications."

(Doc. 21 at 10-11.) The Commissioner is correct that these treating providers found many of the same limitations Dr. Krueger found. Ms. Schweedler found a marked limitation in every category in which Dr. Krueger found one. (*Compare* AR 497-98 *with* AR 48-49.) She also opined that Ms. Bleau had five additional marked limitations.[20] Ms. Schweedler, like Dr. Krueger, opined that Ms. Bleau met Listings 12.04 and 12.06 for mental impairments. (AR 657-58.)

Dr. Sievert, in turn, found three fewer marked limitations than Dr. Krueger; unlike Dr. Krueger, he found only slight or moderate impairments in Ms. Bleau's abilities to "[u]nderstand and remember very short and simple instructions," "[i]nteract appropriately with the general public," and "[r]espond appropriately to changes in the work place." (AR 500-01.) However, Dr. Sievert found Ms. Bleau markedly impaired in other abilities Dr. Krueger found to be only slightly or moderately impaired, including the abilities to "accept instructions and respond appropriately to criticism from supervisors," "be aware of normal hazards and take adequate precautions," and "set realistic goals or make plans independently of others." (*Compare* AR 500-01 *with* AR 48-49.)

As for Mr. Lessen, he opined that Ms. Bleau had only three marked limitations, but two of them – the ability to "[w]ork in coordination with/or proximity with others without being distracted by them" and the ability to "[i]nteract appropriately with the general public" – were consistent with marked limitations Dr. Krueger found. (Compare AR 660-61 *with* AR 48-49.) Additionally, Mr. Lessen found Ms. Bleau markedly limited in her ability to "accept instructions and respond appropriately to criticism from supervisors." (AR 660-61.) Like Dr. Krueger and Ms. Schweedler,

---

[20] In addition to the marked impairments that Dr. Krueger found, Ms. Schweedler also found Ms. Bleau markedly impaired in her abilities to: "[c]arry out very short and simple instructions," "[m]ake simple work-related decisions," "[a]ccept instructions and respond appropriately to criticism from supervisors," "[g]et along with coworkers or peers without distracting them or exhibiting behavioral extremes," and "[s]et realistic goals or make plans independently of others." (AR 497-98.)

Mr. Lessen determined that Ms. Bleau met Listings 12.04 and 12.06 for mental impairments. (AR 662-63.)

The ALJ gave "little weight" to Ms. Schweedler's opinions and "partial weight" to the opinions of Dr. Sievert and Mr. Lessen. (AR 20.) Although the ALJ determined that Ms. Bleau's depression and bipolar disorder supported slight to moderate limitations, he concluded that marked limitations were inconsistent with the record. (AR 21.) The ALJ acknowledged that Ms. Bleau was hospitalized for several days in 2015 for mental health problems and that, in March 2016, she tried to commit suicide. (AR 18.) He also noted that, at times, Ms. Bleau had an impaired ability to make reasonable decisions. (AR 14.)

Nevertheless, the ALJ found that Ms. Bleau's records suggested her "insight and judgment [were] . . . within normal limits," her "memory was . . . normal," her "cognition was within normal limits," her "intelligence was estimated to be average," and she demonstrated "normal attention span and concentration." (*Id*.) He concluded that her "symptoms [were] fairly well-controlled with medication" and emphasized that Ms. Bleau was able to volunteer at a horse farm and travel out of state. (*Id*.) "[T]o account for [her] mental health symptoms . . . [the ALJ] limited [Ms. Bleau] to simple, routine tasks in an environment with limited social interactions and changes requiring no more than simple work-related decisions." (AR 21.)

The Commissioner's argument here – that Dr. Krueger's opinions would not change the outcome of the case, given that the ALJ already rejected similar opinions from other providers – has superficial appeal but does not survive close inspection. This is because the reasons the ALJ gave for rejecting the other providers' opinions do not apply to Dr. Krueger's opinions.

First, the ALJ criticized Ms. Schweedler for providing "no explanation for [her] extreme limitations." (AR 20.) He reasoned that Ms. Schweedler's treatment records showed a "mental

status [that] was generally normal other than a depressed and anxious mood" as well as the ability to "exercis[e] three to four times a week and clean[] up after animals." (AR 20 (citing AR 480, 482).) In her records, Ms. Schweedler described Ms. Bleau's thought process as "[l]ogical," her cognition, insight, and judgment as "[w]ithin normal limits," and her intelligence as "[a]bove average." (AR 482.) As such, the Court agrees that Ms. Schweedler's records standing alone are inadequate to support some of her opinions regarding Ms. Bleau's limitations.

However, Dr. Krueger backed his opinions with objective evidence, *i.e.*, his clinical interview, observations, records review, and psychometric testing of Ms. Bleau. This evidence is wholly consistent with the marked limitations he identified, most notably in the area of maintaining concentration, persistence, and pace. Specifically, Dr. Krueger's testing shows that Ms. Bleau has "significant impairment with most cognitive skills that were tested," including "evidence of having a mathematics disorder," "significant impairment with concentration and memory skills," "serious impairment with visual motor processing speed," and "borderline intellectual functioning." (AR 39-42.) Simply put, Dr. Krueger's records lend credence not only to his own opinions but also to many of Ms. Schweedler's.

Next, the ALJ adopted the slight-to-moderate limitations that Dr. Sievert and Mr. Lessen identified; however, he rejected the marked limitations they found. In so holding, he explained that Ms. Bleau is "generally stable on medication" and that the "medical evidence of record does not support the marked limitations." (AR 20-21.) However, just as Dr. Krueger's records support Ms. Schweedler's opinions, they also support those of Dr. Sievert and Mr. Lessen. Not only do Dr. Krueger's records show significant impairment in Ms. Bleau's cognitive skills and processing speed, but also they indicate that Ms. Bleau "presented with a high level of anxiety" and "show[ed] clear evidence of depression" despite the mood-stabilizing drugs she takes. (AR 39.) If accepted,

these findings undermine the ALJ's determination that Ms. Bleau's mood was stable on medication and that the record fails to support more restrictive mental limitations.

The ALJ did not have the benefit of Dr. Krueger's report, test results, and opinions when he rejected the marked mental impairments that Ms. Schweedler, Dr. Sievert, and Mr. Lessen found. There is a reasonable probability that the ALJ's assessment of these providers' opinions' consistency with the record would be altered if he were to consider them alongside Dr. Krueger's evidence. Moreover, there is a reasonable probability that the ALJ's consideration of Dr. Krueger's opinions would alter his RFC determination. If the ALJ were to adopt even *some* of the marked limitations Dr. Krueger found, Ms. Bleau's RFC would be more restrictive and would likely preclude employment altogether. As such, the Court finds that Dr. Krueger's records are material and there is a reasonable probability that they would change the outcome of Ms. Bleau's disability claims.

Having determined that the additional evidence Ms. Bleau submitted to the Appeals Council is new, chronologically pertinent, material, and has a reasonable probability of changing the outcome of her disability claims, the Court finds that the Appeals Council erroneously failed to consider it. As such, the case must be remanded for review of the additional evidence as required under 20 C.F.R. §§ 404.970(a)(5) and 416.1470(a)(5).

## B.     Remaining Claims

Ms. Bleau advances several additional arguments in support of her motion to remand. (*See generally id.*) However, because the Court concludes that remand is required as set forth above, it will not address these remaining claims of error. *See Chambers*, 389 F.3d at 1143 (explaining that it is for the Appeals Council to "determine in the first instance whether, following submission of additional, qualifying evidence, the ALJ's decision is contrary to the weight of the evidence

currently of record"); *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) (explaining that the reviewing court does not reach issues that may be affected on remand).

## IV.  Conclusion

For the reasons stated above, IT IS HEREBY ORDERED that Ms. Bleau's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 17) is GRANTED.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
United States Magistrate Judge
Presiding by Consent